UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CONCRETE WASHOUT SYSTEMS,
INC., a California
corporation,

        NO. CIV. S-04-1005 WBS DAD

     Plaintiff,

  v.

MINEGAR ENVIRONMENTAL SYSTEMS,
INC., a California
corporation, PETER J. MINEGAR,
and DOES 1-10,

     Defendants.

        MEMORANDUM AND ORDER
        RE: MOTION FOR SUMMARY
        JUDGMENT

----oo0oo----

     Plaintiff Concrete Washout Systems, Inc. ("CWS") brings claims against defendants Minegar Environmental Systems, Inc. ("MES") and Peter J. Minegar for (1) a declaratory judgment pursuant to 28 U.S.C. § 2201 (Declaratory Judgment Act) to the effect that CWS invented an invention disclosed in a patent application submitted by MES and that defendants have a duty to correct the Minegar patent application to list Jenkins as the inventor of the invention claimed in that application; (2) service mark and trade name infringement under 15 U.S.C. §

1

1125(a) (Lanham Act); and (3) several violations of California
law.[1]

    Jurisdiction is predicated upon 15 U.S.C. § 1125(a)
(Lanham Act), 28 U.S.C. §§ 1331 (federal question) and 1338
(claims arising under Act of Congress relating to patents), 28
U.S.C. § 2201 (Declaratory Judgment Act), and 28 U.S.C. § 1367
(supplemental jurisdiction).  Defendants move for summary
judgment on all plaintiff's claims pursuant to Federal Rule of
Civil Procedure 56.

I.   Factual and Procedural Background[2]

    CWS is incorporated as "Concrete Washout Systems, Inc."
(See Howard Reply Decl. Ex. H (Printout form California Business
Portal)).  CWS licenses concrete washout containers to licensees
who in turn rent them to their contractor customers.  (See Howard
Decl. Ex. M (Pl.'s Response to Interrogs.) at 2).  On or about
February 7, 2003, Mark Jenkins, president and shareholder of CWS,
filed a patent application for a concrete washout container.
(Gibson Decl. Ex. B-1 (Jenkins Dep.) 47:3-8; Howard Decl. Ex. D
(Jenkins Dep.) 25-9:16)).  The invention is a system to collect

---

    [1]   These claims include declaratory relief under state
law, trade name infringement under California Business and
Professions Code § 14415, misappropriation of trade secrets under
California Civil Code § 3426.1(d), common law misappropriation,
fraud, constructive fraud, breach of confidence, unjust
enrichment, unfair competition under California Business and
Professions Code § 17200, and false advertising under California
Business and Professions Code § 17500.

    [2]   Both plaintiff and defendants have objected to evidence
submitted in this matter.  (See Pl.'s Mem. of P. & A. in Opp'n to
Defs.' Mot. for Summ. J. at 13; Defs.'s Objection to CWS'
Evidence in Opp'n to Defs.' Mot. for Summ. J.).  These
evidentiary objections have been mooted either by responsive
authentication or by the court's determination that it need not
rely on the evidence at issue.

1  concrete waste and residue water.  (Gibson Decl. Ex. B-1 (Jenkins

2  Dep.) Ex. 5 (patent application)).  Thereafter, Jenkins assigned

3  his patent application to CWS.  (See Howard Decl. Ex. M (Pl.'s

4  Response to Interroggs. at 2)).

5        Defendant Peter J. Minegar ("Mr. Minegar") has been a

6  concrete contractor for over 25 years and owns Minegar

7  Contracting, Inc. ("Minegar Contracting").  Minegar Contracting

8  is a concrete contracting company which produces concrete floors

9  and paving for commercial and industrial projects.  Minegar

10  Contracting's operations produce substantial amounts of concrete

11  waste residue, commonly known as "concrete washout," that must be

12  disposed of in accordance with state and federal regulations.

13  (Minegar Decl. ¶¶ 1-2).

14        In June 2003, Minegar Contracting began designing a

15  container dedicated to the collection and disposal of concrete

16  washout waste.  (Minegar Decl. ¶¶ 1-3).  In June of 2003, Mr.

17  Minegar engaged steel fabricator Serrano Motor Company

18  ("Serrano") to manufacture a concrete washout container according

19  to his specifications.  (Id. ¶ 3).  Thereafter, Mr. Minegar

20  uncovered CWS' website on which it advertised its own concrete

21  washout container.  (Id. ¶ 4).  As his interest piqued, Mr.

22  Minegar met and spoke with representatives from CWS on or about

23  July 25, 2003.  (See Howard Decl. Ex. A (Minegar Dep.)

24  (hereinafter "Minegar Dep.") 36:15-25).  Mr. Minegar expressed an

25  interest in becoming a CWS licensee and requested an opportunity

26  to meet with CWS to discuss a business relationship.  (Id.).  Mr.

27  Minegar was later shown one of CWS' containers on a job site.

28  (Howard Decl. Ex. E (Neilsen Dep.) 13:12-23).  Mr. Minegar then

3

1  began negotiations with Mr. Jenkins for a license fee for CWS'

2  concrete washout container.  (Minegar Dep. 41:3-42:2).

3       While negotiations were still pending, CWS sent Mr.

4  Minegar a standard information packet that included a cash flow

5  forecast.  (Howard Decl. Ex. R (Information Packet) and R.1 (Cash

6  Flow Forecast)).  Roger Engelsgaard, a shareholder and officer of

7  CWS, (Howard Decl. Ex. D (Jenkins Dep.) 7:25-9:16), sent Mr.

8  Minegar a draft agreement on August 15, 2003.  (Id. Ex. S (Draft

9  Agreement).  Mr. Minegar states that he was dissatisfied with the

10  proposed terms.  (See Minegar Dep. 79:9-21).

11       At the August 21, 2003 meeting, Kevin Mickelson

12  (another shareholder and officer of CWS) and Mr. Engelsgaard took

13  Mr. Minegar on a tour of CWS' operations and showed him the basic

14  operations of CWS' concrete washout container.  (Id. 55:11-57:13;

15  Howard Decl. Ex. D (Jenkins Dep.) 7:25-9:16).  Mr. Minegar also

16  asked to see CWS' patent application so he could evaluate the

17  value of the CWS container as a licensed product.  (Minegar Dep.

18  57:6-11).  Instead, CWS chose to provide Mr. Minegar with a

19  patentability opinion letter that its lawyer, John O'Banion, had

20  prepared concerning the container.  (Howard Decl. Ex. B

21  (Mickelson Dep.) 66:11-14).

22       Thereafter, Mr. Minegar sent CWS a letter terminating

23  negotiations on September 11, 2003.  (Minegar Dep. 115:17-

24  117:11).  Mr. Minegar completed development of his own concrete

25  washout container in late 2003, then began marketing the

26  container through MES in early 2004.  (See Howard Decl. Ex. X

27  (Photograph of Minegar's Container)).  Mr. Minegar then filed a

28  patent application for his concrete washout container and

1  assigned the application to MES.  (See Minegar Dep. 10:3-5).[3]

2  CWS retained an expert who stated in a report that, in his

3  opinion, most of the claims in Minegar's patent application are

4  derivative of CWS' invention and that CWS is the proper inventor

5  of most of the claims.  (Maquire Decl. Ex. A (Rule 26 Report of

6  Daniel P. Maguire dated May 10, 2005).

7       A Stormwater Best Manual Practices ("BMP") Handbook

8  dated January 2003 requires construction entities to label their

9  disposal areas with the term "concrete washout."  (Howard Decl.

10 Ex. E (Storm Water Handbook)).  Mr. Minegar states that

11 defendants place the term "Concrete Washout Only" on their

12 containers to provide notice as to the type of material that

13 should be deposited in their containers.  (Minegar Decl. ¶ 12).

14      Mr. Mickelson, CWS' vice president, has testified that

15 CWS coined the phrase "concrete washout."  (Gibson Decl. Ex. C-1

16 (Mickelson Dep.) 141:12-21).  CWS uses the term "concrete

17 washout" on its website and its marketing materials to refer to

18 concrete waste.  (See Concrete Washout Systems, Inc., CWS

19 Solutions and Benefits (July 6, 2005) available at

20 http://www.concrete.com/pages/cws_solutions/; see also  Howard

21 Decl. Ex. DD (CWS' Marketing Materials).  Mr. Mickelson also

22 testified that the term "concrete washout" is used as a label for

23 "any sort of structure that is used to capture and contain

24 concrete waste."  (Howard Decl. Ex. B (Mickelson Dep.) 7:52-6;

25 143:4-11).  An Erosion Control Association News Letter published

26

27       [3]   Defendants do not point to any evidence of the
28 assignment to MES.  However, CWS does not dispute that such an
   assignment occurred.

5

1  in 2002 refers to concrete waste as "concrete washout." (Howard
2  Reply Decl. Ex. D (Erosion Control Association News Letter)).

3         On May 24, 2004, CWS filed this action against
4  defendants.  CWS amended its complaint on September 30, 2004.
5  Defendants now move for summary judgment on all CWS' claims.
6  II.  Discussion

7         The court must grant summary judgment to a moving party
8  "if the pleadings, depositions, answers to interrogatories, and
9  admissions on file, together with the affidavits, if any, show
10 that there is no genuine issue as to any material fact and that
11 the moving party is entitled to judgment as a matter of law."
12 Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
13 judgment may not simply deny generally the pleadings of the
14 movant; the adverse party must designate "specific facts showing
15 that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
16 Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a
17 summary judgment motion cannot be defeated by relying solely on
18 conclusory allegations unsupported by factual data."  Taylor v.
19 List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The nonmoving party
20 must show more than a mere "metaphysical doubt" as to the
21 material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
22 U.S. 574, 587 (1986).

23      A.   Declaratory Relief Under 28 U.S.C. § 2201

24         Pursuant to 28 U.S.C. §§ 1338 and 2201, and 35 U.S.C. §
25 116, plaintiff seeks a declaratory judgment that (1) Jenkins is
26 the inventor of the invention described in the Minegar patent
27 application and (2) defendants have a duty to correct the Minegar
28 patent application to list Jenkins as the inventor of the

6

invention claimed in that application.  (See Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. J. at 11-12).[4]  Defendants make two arguments in response.  First, defendants contend that the court does not have subject matter jurisdiction to reach issues of inventorship.  Second, defendants argue that, even if the court does have subject matter jurisdiction to reach issues of inventorship, the court should decline to exercise that jurisdiction, because such issues are best left for the Patent and Trademark Office to decide.  Of defendants' arguments, only the latter prevails.

        Several district courts, whose reasoning the court finds persuasive, have determined that federal courts have subject matter jurisdiction to resolve inventorship issues under 28 U.S.C. § 1338(a).[5]  See Post Peformance, LLC v. Renaissance Imports, Inc., 333 F. Supp. 2d 834 (E.D. Mo. 2004); Murray v. Gemplus Int'l, S.A., 2002 U.S. Dist. LEXIS 22272 (E.D. Pa. Oct. 29, 2002); Display Research Labs., Inc. v. Telegen Corp., 133 F. Supp. 2d 1170 (N.D. Cal. 2001); Mieling v. Norkar Techs., 176 F.

----

        [4]   Plaintiff also seeks a declaratory judgment that defendants have a duty to assign to CWS the Minegar patent application and all rights associated with that application.  However, plaintiff bases this claim for relief on state law.  (Id.).  Therefore, this claim will be addressed elsewhere.

        [5]   Defendants cite Eli Lilly & Co. v. Aradigm Corp., 276 F.3d 1352, 1356 n.1 (Fed. Cir. 2004) for the proposition that 35 U.S.C. § 116 does not create a cause of action to modify inventorship on pending patent applications.  (See Defs.' Mem. of P. & A. in Support of Defs.' Mot. for Summ. J. at 11).  Eli Lilly does support this proposition.  However, the case does not hold that courts lack subject matter jurisdiction over inventorship claims based on 28 U.S.C. § 1338(a).  Because plaintiff brings this cause of action under 28 U.S.C. § 1338(a), Eli Lilly is inapposite.

1   Supp. 2d 817 (N.D. Ill. 2001); <u>Heinken Tech. Servs. v. Darby</u>, 103

2   F. Supp.2d 476 (D. Mass. 2000); <u>but see</u> <u>Sagoma Plastics, Inc. v.</u>

3   <u>Gelardi</u>, 366 F. Supp. 2d 185 (D. Me. 2005)(finding there would be

4   no cause of action under § 116 on which to go forward even if

5   subject matter jurisdiction were appropriate).  Therefore, the

6   court rejects defendants' first argument.

7        However, even where a court has subject matter

8   jurisdiction to grant declaratory relief, it is well settled that

9   the court has discretion to decline to exercise that

10  jurisdiction.  <u>See</u> <u>Telegen</u>, 133 F. Supp. 2d at 1175(noting that

11  "[t]he decision to grant declaratory relief is a matter of

12  discretion, even when the court is presented with a justiciable

13  controversy.")(citing <u>A.L. Mecling Barge Lines, Inc. v. United</u>

14  <u>States</u>, 368 U.S. 324, 331 (1961)(additional citations omitted);

15  <u>Post Performance</u>, 333 F. Supp. 2d at 840(noting that court has

16  discretion to decline to exercise jurisdiction where declaratory

17  relief is requested).

18       It is thus not surprising that even some of the courts

19  that have found subject matter jurisdiction over inventorship

20  issues under 35 U.S.C. § 116, have declined to exercise that

21  jurisdiction when requested to grant declaratory relief regarding

22  such issues.  <u>See</u> <u>Telegen</u>, 133 F. Supp. 2d 1170(declining to

23  exercise jurisdiction in part because PTO was better forum for

24  resolving inventorship disputes); <u>Mieling</u>, 176 F. Supp. 2d at

25  819-20(holding that established procedures of the PTO were a more

26  apt vehicle for determining the inventorship of the claims in the

27  patent application).

28       Because the PTO has not yet had the opportunity to

8

reach the issues of inventorship disputed in this case, the court determines that it would be best to decline to exercise its jurisdiction over this claim.  This decision comports with the text of the Patent Act which implicitly recognizes that the court is best advised to reach issues of inventorship after the PTO has reached them.  Specifically, 35 U.S.C. § 116 makes it the prerogative of the Director of the PTO to correct errors in inventorship of pending patent applications.[6]  In contrast, 35 U.S.C. § 256 authorizes federal courts to adjudicate inventorship of a patent <u>after</u> the patent has issued.[7]

The statutory scheme seems to have been developed with the understanding that adjudicating claims over inventorship in patent applications would disrupt the patent application system. As defendants note in their reply, they are free to work through the regular patent process, amending their patent application to the extent necessary to avoid having it read on CWS' patent

---

[6]   Whenever through error a person is named <u>in an application for patent</u> as the inventor, or through error an inventor is not named <u>in an application</u>, and such error arose without any deceptive intention on his part, <u>the Director [of the United States Patent and Trademark Office]</u> may permit the application to be amended accordingly, under such terms he prescribes.

35 U.S.C. § 116(emphasis added).

[7]   The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred it if can be corrected as provided in this section.  <u>The court</u> before which such matter is called in question may order correction of <u>the patent</u> on notice of hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256(emphasis added).

9

application, or, perhaps, even abandoning it.  (See Reply Brief

in Supp. of Defs.' Mot. for Summ. J. ("Reply Brief") at 7).  If

defendants abandon their application or if the PTO denies it, the

inventorship issues at stake in this case may become moot.  On

the other hand, should the PTO decide to grant defendants' patent

application, CWS can always bring a claim challenging the

inventorship of the patent under 35 U.S.C. § 256.  CWS suffers

only delay from this court's decision to let the PTO patent

application review process run its natural course, whereas,

reaching the inventorship issues now would be a waste of judicial

resources.  The court thus declines to exercise its discretion to

reach issues that may disappear on their own.

    B.   Service Mark and Trade Name Infringement Under 15

         U.S.C. § 1125(a)

         Plaintiff contends that defendants have infringed its

unregistered trademark and/or trade name, "Concrete Washout," in

violation of the Lanham Act.[8]  (See Pl.'s Mem. & P. & A. in Opp'n

---

[8]     The relevant provision of the Lanham Act states that

        Any person who, on or in connection with any goods or
        services, or any container for goods, uses in commerce
        any word, term, name, symbol, or device, or any
        combination thereof, or any false designation of
        origin, false or misleading description of fact, or
        false or misleading representation of fact, which—
             (A) is likely to cause confusion, or to cause
        mistake, or to deceive as to the affiliation,
        connection, or association of such person with
        another person, or as to the origin, sponsorship,
        or approval of his or her goods, services, or
        commercial activities by another person, or
             (B) in commercial advertising or promotion,
        misrepresents the nature, characteristics,
        qualities, or geographic origin of his or her or
        another person's goods, services, or commercial
        activities,

1   to Defs.' Mot. for Summ. J. at 25).  Defendants argue that CWS'

2   actual trademark and trade name are actually "Concrete Washout

3   Systems, Inc."  (See Howard Reply Decl. Ex. H (Printout form

4   California Business Portal)).  Defendants contend that this

5   distinction is relevant because the more general term "Concrete

6   Washout" is broader in scope than CWS' actual trademark/trade

7   name.  However, the court need not decide this issue because,

8   even if CWS can claim the broader term "Concrete Washout" as its

9   own, the term is generic and not protected by the Lanham Act.

10          Because the same standards apply to trademark and trade

11  name infringement, and because courts, like the parties in this

12  case, rarely distinguish between the two types of infringement,

13  the court analyzes the two claims together.  See Accuride Int'l,

14  Inc. v. Accuride Corp., 871 F.2d 1531, 1534-35 (9th Cir. 1989)

15  (noting the overlap between the types of infringement and the

16  overlapping standard for determining both types of infringement).

17          Case law recognizes four different categories of terms

18  with respect to trademark/trade name protection under the Lanham

19  Act: (1) generic, (2) descriptive, (3) suggestive, and (4)

20  arbitrary or fanciful.  Filipino Yellow Pages, Inc. v. Asian

21  Journal Publ'ns, Inc., 198 F.3d 1143, 1147 (9th Cir. 1999).  The

22  strength of a mark is determined by its placement on the

23  continuum of marks from "generic," afforded no protection,

24  through "descriptive" or "suggestive," given moderate protection,

25  _____

26                    shall be liable in a civil action by any person who
                      believes that he or she is or is likely to be damaged
27                    by such act.

28  15 U.S.C. § 1125(a)(emphasis added).

                                    11

1  to "arbitrary" or "fanciful," awarded maximum protection.

2  <u>Ultrapure Sys. v. Ham-Let Group</u>, 921 F. Supp. 659, 662 (N.D. Cal.

3  1996).  According to the Ninth Circuit, "[a] generic term is one

4  that refers, or has come to be understood as referring, to the

5  genus of which the particular product or service is a species.

6  It cannot become a trademark [or trade name] under any

7  circumstances."  <u>Filipino</u>, 198 F.3d at 1147.

8         The evidence submitted establishes that "concrete

9  washout" is not a trademark or trade name, but a generic term

10  which refers to concrete waste residue, ordinarily consisting of

11  a mixture of concrete and water.  Even if CWS' contention that it

12  initially coined the term is true (<u>see</u> Gibson Decl. Ex. C-1

13  (Mickelson Dep.) 141:12-21), the evidence demonstrates that the

14  term has become generally used.

15         CWS admits that Mickelson testified that other parties

16  have used the words "concrete washout" in referring to concrete

17  waste.  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 23).

18  CWS also uses the term "concrete washout" generically on its

19  website and marketing materials to refer to concrete waste.  (<u>See</u>

20  Concrete Washout Systems, Inc., <u>CWS Solutions and Benefits</u> (July

21  6, 2005) <u>available at</u> http://www.concrete.com/pages/cws_

22  solutions/("We at CWS are committed to ensuring our product and

23  services are the solution to the problems associated with

24  <u>concrete washout</u> containment on jobsites.")(emphasis added); <u>see</u>

25  <u>also</u>  Howard Decl. Ex. DD (CWS' Marketing Materials)

26  (referring to "concrete washout containment areas")).  Defendants

27  overstate the significance of CWS' use of the term "concrete

28  washout" by claiming the use estops CWS from alleging trademark

1   or trade name  infringement.[9]  Nevertheless, the Ninth Circuit

2   has recognized that such use is "strong evidence" that the term

3   is generic.  <u>Self-Realization Fellowship Church v. Anada Church</u>

4   <u>of Self-Realization</u>, 59 F.3d 902, 906-07 (9th Cir. 1995).

5   Defendants also point to an Internal Erosion Control Association

6   newsletter published in 2002 and published cases (with dates

7   prior to when Jenkins filed his patent application) which refer

8   to concrete waste as "concrete washout."  (<u>See</u> Howard Reply

9   Decl., Exs. D (Erosion Control Association Newsletter) & E (Storm

10  Water Handbook)); <u>see also</u> <u>Dietrich Int'l Truck Sales, Inc. v.</u>

11  <u>J.S. & J. Services, Inc.</u>, 3 Cal. App. 4th 1601, 1611 (1992)

12  (discussing "physical injury to the land itslef, such as . . .

13  the dumping of concrete washout."); <u>Schweitzer Constr. v. Ohio</u>

14  <u>DOT</u>, 62 Ohio Misc.2d 140, 145 (1990)("ODOT took no samples of

15  this concrete washout.").  Together, this evidence demonstrates

16  that "concrete washout" is a generic term used to refer to waste

17  material consisting of a mixture of concrete and water.

18       CWS attempts to split hairs by arguing that "concrete

19  washout" may be generic as applied to concrete waste but not as

20  applied to a concrete waste container.  (<u>See</u> Pl.'s Mem. of P. &

21  A. in Opp'n to Defs.' Mot. for Summ. J. at 23).  This artificial

22  distinction is unavailing.  The evidence before the court also

23  establishes that "concrete washout," as used in reference to bins

24  used to store waste, is generic.

25  _____

26       [9]   Defendants cite <u>Bellsouth Corp. v. White Directory</u>
    <u>Publishers, Inc.</u>, 42 F. Supp. 2d 598 n.5 (M.D.N.C. 1999) for the
    proposition that CWS is estopped from alleging trademark
27  infringement.  However, <u>Bellsouth</u> does not go so far.  Rather, it
    merely recognizes generic use as "strong evidence" of
28  genericness.  <u>Id.</u>

13

1    Defendants point to the California Stormwater BMP
2 Handbook dated January 2003, which requires construction entities
3 to label their disposal areas with the term "concrete washout."
4 (See Howard Decl. Ex. E (Storm Water Handbook)).  Mr. Mickelson,
5 CWS' vice president, even tacitly acknowledged that "concrete
6 washout" as it relates to a container to store concrete washout
7 is generic, when he testified that he has seen a "concrete
8 washout" label applied to "any sort of structure that is used to
9 capture and contain concrete waste."  (Howard, Decl. Ex. B
10 (Mickelson Dep.) 7:52-6; 143:4-11).  This evidence alone is
11 sufficient to grant summary judgment.

12    Additionally, the court applies the who-are-you/what-
13 are-you test, established by the Ninth Circuit, which holds that
14 "if the primary significance of the trademark is to describe the
15 type of product, rather than the producer, the trademark [is] a
16 generic term and [cannot be] a valid trademark."  Filipino, 198
17 F.3d at 1146.  Applying this test here, there is sufficient
18 evidence that the term "concrete washout" is associated with the
19 type of product rather than the producer.  A concrete washout
20 container is simply that, a container in which to deposit
21 concrete washout.  The term says nothing about the product's
22 producer.  Because the term is generic, it cannot be protected.

23    This result is not altered by CWS' contention that the
24 term "concrete washout" is somehow "suggestive" and thus entitled
25 to protection under the Lanham Act.  To determine whether a
26 trademark is suggestive, a court looks at the imaginativeness
27 involved in the suggestions (i.e. how immediate and direct is the
28 thought process from the mark to the particular product.).  Japan

14

1    Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.3d 866, 873 (9th

2    Cir. 2002).   If the mental leap between the word and the

3    product's attribute is not almost instantaneous, this strongly

4    indicates suggestiveness.   Id.  "Concrete washout" is not an

5    imaginative term.   Again, it refers to a waste product.  When

6    associated with a container, the term suggests nothing other than

7    that the container is a suitable place to dump the waste product.

8    The term invokes no suggestion of anything more than a generic

9    container for concrete washout disposal.

10          C.   Remaining State-Law Claims

11          The court has supplemental jurisdiction over Valadez's

12   state-law claims pursuant to 28 U.S.C. § 1367(a).   Under 28

13   U.S.C. § 1367(c)(3), a district court may decline to exercise

14   supplemental jurisdiction over state law claims where the court

15   has dismissed all claims over which it has original jurisdiction.

16   Voigt v. Savell, 70 F.3d 1552, 1565 (9th Cir. 1995).   "In the

17   usual case in which all federal-law claims are eliminated before

18   trial, the balance of factors to be considered under the pendent

19   jurisdiction doctrine – judicial economy, convenience, fairness,

20   and comity – will point toward declining to exercise jurisdiction

21   over the remaining state-law claims."   Carnegie-Mellon Univ. v.

22   Cohill, 484 U.S. 343, 350 n.7 (1988).   The balance of factors

23   indicates that a case properly belongs in state court when the

24   federal-law claims have dropped out of the lawsuit in its early

25   stages and only state-law claims remain.   Id.

26          Here, CWS' federal claims will all be dismissed prior

27   to trial.  Because the court was able to decide CWS' federal

28   claims without reaching the great majority of issues underlying

                                   15

1 CWS' state-law claims remaining in this case, the court will

2 decline to exercise supplemental jurisdiction over the state-law

3 claims pursuant to 28 U.S.C. § 1367(c)(3).

4          IT IS THEREFORE ORDERED that:

5          (1) defendants' motion for summary judgment as to

6 plaintiff's claims for declaratory relief pursuant to 28 U.S.C. §

7 2201 and for service mark and trade name infringement under 15

8 U.S.C. § 1125(a) be, and the same hereby is, GRANTED; and

9          (2) plaintiff's remaining state-law claims be, and the

10 same hereby are, DISMISSED pursuant to 28 U.S.C. § 1367(c)(3).

11 DATED: July 12, 2005

12

13

14          WILLIAM B. SHUBB
          UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28